## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREA PIZZICONI, | ) | 3:23-CV-01080 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORMAN GRAY, | ) | |
| SHERMAN 695, LLC, | ) | |
| CARLTON HIGHSMITH, | ) | |
| DMITRY KRAVTSOZ, | ) | August 22, 2025 |
| A DONALD JANEZIC, | ) | |
| MARIA GRAY, | ) | |
| TYLER FLOYD, | ) | |
| VANESSA RESEARCH HOLDINGS, | ) | |
| INC., | ) | |
| LORNA GRAY, and | ) | |
| TREVIRA BOATRIGHT, | ) | |
| *Defendants*. | ) | |

## RULING ON APPLICATION FOR PREJUDGMENT REMEDY
## [ECF No. 149] AND MOTION FOR DEFAULT JUDGMENT [ECF No. 148]

Kari A. Dooley, United States District Judge

Plaintiff Andrea Pizziconi ("Plaintiff" or "Pizziconi") brought this action against multiple Defendants, including, as relevant here, Norman Gray ("Gray" or "Norman Gray") and Sherman 695, LLC ("Sherman 695") (collectively, the "Defendants").  Plaintiff alleges that Norman Gray, in his role as CEO of co-defendant Vanessa Research Holdings, Inc. ("Vanessa Research"), conducted a multi-faceted scheme to defraud her out of more than $1 million.  Plaintiff further alleges that Gray used Sherman 695 to carry out this fraudulent scheme by channeling goods and assets through that entity.

Norman Gray, who has appeared in this case *pro se*, was convicted of wire fraud in the Southern District of New York on May 29, 2024.  The charges derive from the same nucleus of facts alleged in Pizziconi's Second Amended Complaint.  Indeed, Pizziconi testified at Gray's

criminal trial, and the Court in the criminal case against Gray found her testimony credible. *United States v. Gray*, No. 21-CR-713 (PAE), 2024 WL 4627566, at *1, *11 (S.D.N.Y. Oct. 30, 2024). Sherman 695 has never appeared in this case, and the Court entered a default against it on March 13, 2024. ECF No. 52. Plaintiff filed an application for prejudgment remedy ("PJR") against Gray seeking a prejudgment award in the amount of $7,263,511.77 as a reasonable estimate of her provable damages. She also filed a motion for disclosure of assets so that she may seek an order of attachment pursuant to Conn. Gen. Stat. § 52-278n (together, the "Application"). The Court held a hearing on the Application on February 7, 2025. Although convened as an evidentiary hearing, Plaintiff elected to proceed on her written submission only, and so the Court held oral argument in lieu of hearing testimony. Gray, who was incarcerated in New Jersey at the time, did not appear, nor did he contact the Court in advance of the hearing. After the hearing, he requested that the hearing be reopened and that he be permitted to appear. ECF No. 168. As no evidentiary hearing had occurred, the Court simply gave Gray the opportunity to submit additional materials for the Court's consideration. ECF No. 181. He failed to do so.

Plaintiff also filed a Motion for Default Judgment as to Sherman 695,[1] seeking a monetary judgment in the amount of at least $5,283,061.77,[2] plus prejudgment interest at a rate of 10% annually. Default J. Mem., ECF No. 148, at 25–27.

---

[1] Inexplicably, the Application also sought a PJR against Sherman 695 even though, simultaneously, Plaintiff sought a default judgment against Sherman 695. As the Court addresses the motion for default judgment herein, the application for a prejudgment remedy as to Sherman 695 is rendered moot.

[2] Plaintiff seeks either $5,283,061.77 or $5,561,138.52 in damages from Sherman 695, depending on which mortgage interest rate is used to calculate her proposed damages. *See infra* at p. 26.

For the reasons set forth in this Order, the Application is GRANTED in part and DENIED in part as to Norman Gray.  The Motion for Default Judgment as to Sherman 965 is GRANTED as set forth herein.

**Factual Allegations and Procedural History**

The Court assumes the parties' familiarity with the voluminous allegations presented in the Second Amended Complaint against Norman Gray and Sherman 695, and thus, it only recites those facts and allegations that are relevant to the Application and Motion for Default Judgment.  As to the allegations against Sherman 695, they are deemed admitted.  *A&B Alternative Mktg. Inc. v. Int'l Quality Fruit Inc.*, 35 F.4th 913, 916 n.4 (2d Cir. 2022).  As to the allegations against Gray, Plaintiff supports her Application with extensive documentation as well as portions of the record from the criminal trial in the Southern District of New York.

Pizziconi is a businesswoman who founded an investment development firm that focuses on mixed-use development projects.  Second Am. Compl. (SAC), ECF No. 151, ¶ 17.  She met Norman Gray for the first time between 2017 and 2018, and he presented himself as a "highly educated and incredibly successful medical device inventor, businessperson, investor, and entrepreneur," who was worth several million dollars.  *Id.* ¶ 25.  However, most of these representations turned out to be blatantly false.[3]  Over the course of several years, Pizziconi

---

[3] The record, to include the record in Norman Gray's criminal prosecution in the Southern District of New York, *see generally United States v. Norman Gray*, Dkt. No. 1:21-cr-713-PAE-1 (S.D.N.Y.), shows that Gray's past is littered with inconsistencies, falsehoods, and frauds.    Norman Gray presented himself to Pizziconi as a multimillionaire investor and businessman with a Ph.D from MIT, who was close personal friends with Bill Gates and had advised former U.S. presidents.  *See* SAC ¶ 75; Ex. 6 to Default J. Mot. ("Pizziconi Testimony"), ECF No. 148-7, at 434:8–13.  None of that was true.  In reality, Norman Gray has a criminal history of fraud and theft that spans 41 years and includes at least 18 arrests across multiple jurisdictions and nations.  Ex. C to PJR Application, ECF No. 149-4, at 10.  Indeed, the Government estimates that Norman Gray has "lived under at least two identities in at least three countries."  *Id.* at 1.  And the Court in that case noted that the fraud that targeted Pizziconi was not, by any means, a "one-off" in Norman Gray's history.  *See id.* at 8.

became more closely acquainted with Norman Gray, and he continued to misrepresent his own financial success and his qualifications to her.

In 2020, Norman Gray was the CEO of Vanessa Research, a biomedical company based in Hamden, Connecticut. *Id.* ¶ 3. Vanessa Research was, purportedly, focused on developing drugs intended to treat children with gastrointestinal diseases in the Global South. *Id.* ¶ 34. However, at the time, Vanessa Research could not sell the drugs that it was researching because they were still in clinical trials and had not been approved. *Id.* ¶ 35. Due to that lack of revenue, Vanessa Research suffered over $1.7 million in losses in the first half of 2020. *Id.* ¶ 44. To make up for that lack of revenue, Norman Gray represented to the board of Vanessa Research and to Pizziconi that he intended to expand Vanessa Research's business to include buying and selling personal protective equipment (PPE) and hand sanitizer. *Id.* ¶ 35. In order to procure PPE, Gray created Sherman 695, an LLC in which he was the sole member and signatory, and which was "closely connected" to Vanessa Research. *Id.* ¶ 42; Ex. 10 to Default J. Mot. ("Pizziconi Decl."), ECF No. 148-11, ¶ 1.

In the summer of 2020, Norman Gray (operating through Sherman 695) procured PPE through a third party. SAC ¶ 42. However, because of defects in the products, Vanessa Research was unable to sell the vast majority of the PPE that was procured. *Id.* ¶¶ 48–50. Due to significant losses, Vanessa Research became unable to cover its payroll, debts, and other expenses. *Id.* ¶¶ 43, 50–52. Enter Plaintiff Pizziconi.

In August 2020, Norman Gray began recruiting Pizziconi to invest in Vanessa Research. *Id.* ¶ 56. Eventually, in early September 2020, Pizziconi agreed to invest $250,000 in Vanessa Research, in exchange for a two-percent equity stake in the company, a seat on the board, and a

salaried position as the Chief Investment Officer (CIO).  *Id.*; *Gray*, 2024 WL 4627566, at *1.  On September 3, 2020, Norman Gray emailed Pizziconi with wire instructions for the $250,000 investment.  SAC ¶ 59.  He instructed her to wire the funds to a bank account held in the name of Sherman 695 (the "Sherman 695 Account") because it would "facilitate [her] investment in Vanessa on a more expedited basis."  *Id.*  Norman Gray was the sole signatory on the Sherman 695 Account.  *Id.*  On September 10, 2025, Pizziconi initiated a wire transfer to the Sherman 695 Account for $250,000.  *Id.* ¶ 63.  Although Norman Gray had told Pizziconi that this $250,000 investment would be transferred to Vanessa Research and establish her equity stake in the company, shortly after the funds were deposited, Norman Gray made out a $16,000 check from the account to Vanessa Research and made a $225,000 withdrawal to pay back a loan to an unaffiliated entity.  *Id.* ¶¶ 64–65.  Pizziconi never received her promised two-percent equity stake in Vanessa Research.

Later in September, Norman Gray made another investment proposal to Pizziconi: he proposed a short-term investment deal involving buying and selling PPE from New York University (NYU).  *Id.* ¶ 77.  Norman Gray represented to Pizziconi that "he had a purchase order for PPE lined up worth nearly $8,000,000, and that, with the purchase orders in hand, the risk was virtually zero."  *Id.*  He also claimed that Pizziconi could expect a return on investment of 40% or more within 90 days, and that regardless, Pizziconi's funds would be returned to her no later than January 2021.  *Id.*; *see also* Pizziconi Testimony at 416:1–417:4.  Although Pizzicnoi was at first hesitant about another investment (and because she needed cash on hand to close on a home she was purchasing with a mortgage), Norman Gray allayed her worries by offering her a line of credit against the PPE investment.  *Id.* ¶ 79.

5

On September 25, 2020, Norman Gray, on behalf of Sherman 695 as the signatory, drafted a Joint Venture Agreement (JVA) between Sherman 695 and Pizziconi. Ex. 8 to Default J. Mot. ("JVA"), ECF No. 148-9; Pizziconi Testimony at 417:8–19, 425:5–426:11. The JVA specified that, in exchange for a $500,000 investment by Pizziconi for PPE, Sherman 695 would purchase and distribute that PPE and divide the profits 50-50 between itself and Pizziconi. *See* JVA; SAC ¶ 203. The JVA also promised that Pizziconi would receive her funds or profit from the investment by no later than January 2021. *See* JVA ("The Parties, representing their respective funds, shall determine to return the original investment in four months . . . ."). That same day, Pizziconi initiated a wire transfer for $500,000 to the Sherman 695 Account, pursuant to the JVA. SAC ¶ 81. That money was later withdrawn from the account and used for non-PPE purposes: namely, $160,000 was deposited into Vanessa Research's account to cover its payroll, and $41,000 was withdrawn to make payments towards one of Vanessa Research's delinquent business loans. *Id.* ¶¶ 82–83. Pizziconi never received those funds back, nor did she ever receive any return of investment. *Id.* ¶ 84; Pizziconi Testimony at 410:1–5.

In October 2020, Norman Gray proposed another PPE deal to Pizziconi, this time with the University of Connecticut ("UConn"). SAC ¶¶ 85–86. Pizziconi had even more reservations about investing more money, especially because she had not yet secured a mortgage to be able to close on a condominium. Superseding Indictment ("S1 Indictment"), Dkt. No. 1:21-cr-713-PAE-1 (S.D.N.Y.), ECF No. 90, ¶ 13. Norman Gray allayed those fears by lying about the existence of a boutique mortgage company called the Tranctus Group in which he was allegedly an investor. *Id.*; SAC ¶ 86. In exchange for a $717,000 investment in the PPE deal, Norman Gray would arrange for Pizziconi to secure a mortgage with the Tranctus Group, and Pizziconi would further

be able to profit from the UConn PPE deal, similar to the NYU PPE deal. SAC ¶ 86. In reliance on these misrepresentations, on October 15, 2020, Pizziconi wired $717,000 to the Sherman 695 Account. *Id.* ¶ 88. Shortly thereafter, $200,000 of those funds was transferred to Vanessa Research to cover its payroll, and it was later revealed that there was never any deal with UConn for PPE. *Id.* ¶ 89; S1 Indictment ¶ 16. Pizziconi never received any return on investment from this transfer, nor did she receive the funds back. SAC ¶ 91.[4]

In total, Norman Gray defrauded Pizziconi out of $1,467,000. More than $700,000 of that amount was used to either cover Vanessa Research's expenses or pay its debts. *Id.* ¶ 104. He allegedly used $171,000 of it to pay credit card balances for himself, co-Defendant Maria Gray, and other Gray family members. *Id.* ¶ 105. Norman Gray also used some funds to purchase a house in Connecticut, a luxury car, and to invest in a variety of other entities that he allegedly controlled. *Id.* ¶¶ 106–07.

---

[4] As the court in Norman Gray's later criminal case aptly summarized:

The trial evidence established that Pizziconi had sent funds to Gray in three tranches. First, in early September 2020, she sent him $250,000, purportedly in exchange for a 2% equity stake and salaried position in Vanessa Research. Second, in late September 2020, she sent him $500,000, as an investment in a deal that Gray had falsely represented he had in place with New York University to supply it with personal protective equipment ("PPE"). Third, in October 2020, she sent Gray an additional $717,000, as an investment in a second non-existent deal to provide a university, this time, the University of Connecticut, with PPE. Gray had secured these funds based on a range of false representations to Pizziconi, including that her money would be invested as promised; that the universities had executed purchase orders for the PPE at issue; that Gray was highly credentialed, including having a Ph.D. from the Massachusetts Institute of Technology; that Gray had significant offshore wealth; and that Gray was an investor in a mortgage company, the Tranctus Group, through which he would arrange financing for Pizziconi's purchase of an apartment during the purportedly brief period when her funds were tied up in the two purported PPE deals.

*Gray*, 2024 WL 4627566, at *1; *see also* SAC ¶ 75.

As a result of the fraud, Pizziconi was unable to close on the condominium she intended to purchase with a mortgage, as it became clear that the "Tranctus Group" did not exist,[5] and her mortgage funding did not materialize. *Id.* ¶¶ 94, 100. Because Pizziconi had already moved out of her apartment, in anticipation of the closing on her condo, she had to secure temporary housing when the closing fell through. *Id.* ¶ 100. Pizziconi allegedly incurred tens of thousands of dollars in storage, moving, and housing costs, as well as other legal fees associated with the failed closing. *Id.*; *see* Ex. 10 to Default J. Mot. ("Pizziconi Decl."), ECF No. 148-11, ¶¶ 4–15.

On November 30, 2021, the Southern District of New York returned an indictment against Norman Gray for one count of wire fraud in violation of 18 U.S.C. § 1343. *See United States v. Norman Gray*, Dkt. No. 1:21-CR-713-PAE-1 (S.D.N.Y.), ECF No. 2. They returned a superseding indictment on March 18, 2024. *See generally* S1 Indictment. On May 29, 2024, following a seven-day jury trial, Norman Gray was convicted and found guilty of wire fraud based on the scheme to defraud Pizziconi out of $1.4 million. *Gray*, 2024 WL 4627566, at *1. The Court, in denying Gray's later Rule 33 motion for a new trial, held that "the Court is not left with any concern that an innocent person may have been convicted." *Id.* at *11 (quotations omitted). Norman Gray was sentenced to 120 months (10 years) imprisonment, as well as three years supervised release and was ordered to pay restitution in the amount of $1,533.675. Judgment, Dkt. No. 1:21-cr-713-PAE-1 (S.D.N.Y.), ECF No. 213.

---

[5] Indeed, Gray misled Plaintiff even longer by making up the fictitious persona of "Benjamin Mabry," purportedly a mortgage agent with Tranctus Group, who sent Pizziconi a bogus mortgage approval letter on October 19, 2020. SAC ¶¶ 93–94. Two days before the scheduled closing, Norman Gray told Pizziconi that the Tranctus Group mortgage "would not materialize in time" for the closing. *Id.* ¶ 95. Norman Gray continued to lie about the forthcoming mortgage funding up until the day of the closing, when the funds never materialized, and Pizziconi was unable to proceed with the closing. *Id.* ¶ 100.

On August 14, 2023, Pizziconi instituted this action against a plethora of defendants, to include Norman Gray, Sherman 695, Carlton Highsmith, Dmitry Kravtsoz, A. Donald Janezic, Maria Gray, Tyler Floyd, and Vanessa Research Holdings, Inc. ECF No. 1. On January 23, 2025, Plaintiff filed the Second Amended Complaint (SAC), which is the operative complaint,[6] and added defendants Trevira Boatright and Lorna Gray. ECF No. 151. In the SAC, Plaintiff asserts claims for common-law fraud, conversion, breach of contract, and emotional distress, as well as several statutory claims for forgery, theft, and securities fraud, against Norman Gray.[7] As against Sherman 695, she asserts common-law fraud, conversion, and breach of contract claims, and a claim for statutory theft.[8]

## Discussion

### Standard for Issuance of a Prejudgment Remedy

In federal court, "throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of

---

[6] Plaintiff filed her motion to amend the complaint on December 27, 2024. ECF No. 147. She then filed the Application on January 22, 2025, and one day later, the Court granted her motion to amend, ECF No. 150, at which point, Plaintiff filed the SAC. Further, the motion hearing on the Application was held after the SAC was filed, on February 7, 2025. ECF No. 160. Thus, even though the Application was filed before the SAC, the Court will evaluate the Application using the allegations in the SAC.

[7] The full list of claims asserted against Norman Gray in the SAC are as follows: fraud (Count 1); statutory theft under Conn. Gen. Stat. § 52-564 (Count 2); forgery under Conn. Gen. Stat. § 52-565 (Count 3); conversion (Count 4); unjust enrichment (Count 5); breach of contract (Count 6); breach of fiduciary duty (Count 8); fraudulent conveyance (Counts 25 and 26); intentional infliction of emotional distress (Count 29); securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (Count 30); securities fraud under Sections 36b-4 and 36b-29 of the Connecticut Uniform Securities Act (Count 31); and securities fraud under Section 73-605 of the Delaware Securities Act (Count 32).

[8] The full list of claims asserted against Sherman 695 in the SAC are as follows: fraud (Count 1); statutory theft under Conn. Gen. Stat. § 52-564 (Count 2); conversion (Count 4); unjust enrichment (Count 5); and breach of contract (Count 6).

the potential judgment." Fed. R. Civ. P. 64(a). Accordingly, this Court can issue a prejudgment

remedy pursuant to Conn. Gen. Stat. §§ 52-278a *et seq.* Under that statute,

> [a] prejudgment remedy is available upon a finding by the court that
> "there is probable cause that a judgment in the amount of the
> prejudgment remedy sought, or in an amount greater than the
> amount of the prejudgment remedy sought, taking into account any
> defenses, counterclaims or set-offs, will be rendered in the matter in
> favor of the plaintiff. . . ."

*TES Franchising, LLC v. Feldman*, 286 Conn. 132, 137 (2008) (quoting Conn. Gen. Stat. § 52-

278d(a)(1)). Probable cause requires less proof than that which is required for a fair preponderance

of the evidence. *Id.* at 137. "[P]robable cause is a bona fide belief in the existence of the facts

essential under the law for the action and such as would warrant a man of ordinary caution,

prudence and judgment, under the circumstances, in entertaining it." *Id.* (quotation omitted).

Probable cause is "a flexible common sense standard" that "does not demand that a belief be

correct or more likely true than false." *Id.* (quotation omitted). In assessing a motion for a

prejudgment remedy, "the trial court's function is to determine whether there is probable cause to

believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." *Id.*

(quotation omitted).

 The party seeking a prejudgment remedy must establish that probable cause exists as to not

only the validity of the plaintiff's claim but also "the amount of the remedy sought." *Id.* at 145–

46. "[T]he party seeking the prejudgment remedy must present evidence that is sufficient to enable

the court to determine the probable amount of the damages involved." *Id.* at 146 (quotation

omitted). Likely damages need not be proven with mathematical precision, but the plaintiff must

present sufficient evidence to permit a reasonable measure of his loss. *Id.* The court has discretion

to order an attachment at or below the remedy sought after considering any defenses,

counterclaims, or setoffs. *Conn. Light & Power Co. v. Gilmore*, 89 Conn. App. 164, 176 (2005), *cert. denied*, 275 Conn. 906 (2005).

### Standard for Issuance of a Default Judgment

Rule 55 of the Federal Rules of Civil Procedure governs motions for default judgment. *See* Fed. R. Civ. P. 55. The two-step process requires first that "Plaintiff obtain an entry of default under Rule 55(a), by showing that the defaulting party 'has failed to plead or otherwise defend.' The second step is to seek a default judgment under Rule 55(b)." *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 460 F. Supp. 3d 164, 176 (D. Conn. 2020) (quoting *Priestley v. Headminder Inc.*, 647 F.3d 497, 504 (2d Cir. 2011)) (quotation marks and internal citations omitted).

"It is well established that a party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the 'sound judicial discretion' of the court." *Cablevision of S. Conn. Ltd. P'ship v. Smith*, 141 F. Supp. 2d 277, 281 (D. Conn. 2001) (quoting *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)). In civil cases, however, "where a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party." *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984). In making this determination and evaluating the allegations asserted against a defendant, the Court may "deem[] all the well-pleaded allegations in the pleadings to be admitted." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997). The Court then assesses whether the allegations, deemed admitted, satisfy the elements necessary to establish liability. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011).

In considering whether to enter default judgment, courts consider a variety of factors, some of which may or may not be implicated by the particular case. These include: the possibility of prejudice to the plaintiff; the merits of the plaintiff's substantive claim; the sufficiency of the complaint; the sum of money at stake in the action; the possibility of a dispute concerning material facts; whether the default was due to excusable neglect (if known); and the strong policy favoring decisions on the merits. *See* 10 Moore's Federal Practice § 55.31(2) (3d ed. 2023); *see also, e.g.*, *Belcourt Pub. Sch. Dist. v. Herman*, 786 F.3d 653, 661 (8th Cir. 2015); *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016); *Rouse v. Broadway & Cooper LLC*, No. 23-CV-7849 (RER) (JAM), 2024 WL 4379070, at *4 (E.D.N.Y. Oct. 3, 2024) ("Courts have significant discretion in granting default judgments and consider the following factors: (1) whether the defendant's default was willful; (2) whether [the] defendant has a meritorious defense to [the] plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." (quotation omitted)).

The PJR Application seeks a prejudgment remedy against Norman Gray on Plaintiff's claims of fraud, statutory theft under Conn. Gen. Stat. § 52-564, conversion, forgery under Conn. Gen. Stat. § 52-565, and unjust enrichment. PJR Mem. of Law, ECF No. 149-1, at 7. In the motion for default judgment against Sherman 695, Plaintiff seeks a default judgment against Sherman 695 on all counts: fraud, statutory theft, conversion, unjust enrichment, and breach of contract. *See generally* Mot. for Default J. ("Default J. Mot."), ECF No. 148.

In considering the Application, the Court has reviewed and relied upon the following materials: Plaintiff's memorandum and exhibits attached to the Application, as well as counsel's arguments during the hearing on February 7, 2025; the pending motion for default judgment

against Sherman 695, and the briefs and exhibits attached thereto, *see generally* Default J. Mot.;

and the trial exhibits and testimony[9] from Norman Gray's criminal trial in the Southern District of

New York, which concluded on May 29, 2024, when the jury returned a guilty verdict, *see*

*generally United States v. Norman Gray*, Dkt. No. 1:21-cr-713-PAE-1 (S.D.N.Y.).

### Fraud as Against Norman Gray and Sherman 695

"Under Connecticut law, a plaintiff must prove the following common law fraud elements:

(1) the defendant made a misrepresentation of fact; (2) the defendant knew or should have known

that the statement was false; (3) the misrepresentation was made to induce the plaintiff to act upon

it; (4) the plaintiff reasonably relied on the misrepresentation; and (5) the plaintiff suffered

pecuniary harm as a result." *In re McCann*, 634 B.R. 207, 216 (Bankr. D. Conn. 2021).

Here, Norman Gray was charged in the Southern District of New York with one count of

criminal wire fraud, in violation of 18 U.S.C §§ 1343. *See generally* S1 Indictment. "To be guilty

of wire fraud, a defendant must (1) 'devis[e]' or 'inten[d] to devise' a scheme (2) to 'obtai[n]

money or property' (3) 'by means of false or fraudulent pretenses, representations, or promises.'"

*Kousisis v. United States*, 145 S. Ct. 1382, 1391 (2025) (alterations in original) (quoting 18 U.S.C.

§ 1343). Norman Gray was charged with the same underlying conduct that Plaintiff alleges in her

complaint: that he "made material representations to [Pizziconi] . . . about, among other things, his

academic and professional credentials, [Vanessa Research's] business activities and revenue, his

---

[9] Plaintiff submitted several judicial documents from Norman Gray's criminal case as exhibits to the Application, including the original indictment, Pizziconi's testimony from the trial, the jury charge, the jury verdict, and the transcript from his bail hearing. *See generally* Pl.'s Exs. B, D, G, H, I, and J, ECF No. 149. During the hearing on the Application, Plaintiff also asked that the Court take judicial notice of the entirety of the criminal docket in that case, which the Court may do. Thus, the Court will consider documents from Norman Gray's criminal case to the extent that they are relevant to the Application. *See, e.g.*, *Weidinger v. Djokic*, No. 22-CV-8388 (RA), 2023 WL 4106274, at *1 n.1 (S.D.N.Y. June 21, 2023) (collecting cases).

own business activities and assets, and the purported purposes for which [Pizziconi's] funds would be used, in order to induce [Pizziconi] to transfer approximately $1,467,000, . . . that GRAY thereafter secretly misappropriated and used for his own enrichment and to further the operations of [Vanessa Research]."  S1 Indictment ¶ 23.  The jury convicted Norman Gray on that count, finding that the Government had established beyond a reasonable doubt that Norman Gray had knowingly devised or participated in a scheme to defraud Pizziconi of money or property by means of false misrepresentations.  Ex. H to PJR Application ("Jury Charges"), ECF No. 149-9, at 20. The evidence presented at trial—including, but not limited to, Pizziconi's own testimony, "extensive email and other communications" with Norman Gray, the testimony of other Gray employees, financial statements, bank records, and numerous fabricated documents—supports the jury's verdict.  *Gray*, 2024 WL 4627566, at \*1–2.  Indeed, Judge Engelmayer in that case described the evidence produced against Norman Gray at trial as "overwhelming."  *Id.* at \*1.  The evidence presented on this record is more than sufficient to establish probable cause that Norman Gray committed common-law fraud against Pizziconi.

As for Sherman 695, the allegations are deemed admitted.  As described above, the allegations include that Norman Gray used the Sherman 695 Account to receive and transfer Pizziconi's money for fraudulent purposes.  The SAC alleges that Pizziconi wired over $1.4 million in three separate tranches to the Sherman 695 Account, after which, Norman Gray, as signatory, withdrew that money to enrich himself, his family and friends, and to keep Vanessa Research afloat.  *See supra* at pp. 4–7.  These allegations are more than sufficient to establish the liability of Sherman 695 on the claims asserted in the SAC.  Indeed, even if not deemed admitted,

the evidence submitted in connection with the PJR Application establishes Sherman 695's liability as well.

Although Sherman 695 was not criminally indicted as Norman Gray was, it was a key player in Norman Gray's fraud against the Plaintiff. In 2020, Norman Gray was the sole member of Sherman 695. Pizziconi Decl. ¶ 1. The evidence shows that Norman Gray used Sherman 695's bank accounts to receive funds from Plaintiff, after he had misled her as to the purpose and recipients of those funds, and that he thereafter would transfer funds from Sherman 695's accounts to himself and others. *See id.* ¶ 2; S1 Indictment ¶¶ 7, 10, 15; *see generally* Pizziconi Testimony. Sherman 695 was also party to the JVA regarding PPE investments, which was a core part of the fraudulent scheme conducted against Plaintiff. Pizziconi Testimony at 417:8–19, 425:5–426:11; *see* JVA; SAC ¶¶ 77–91. The JVA specified that, in exchange for a $500,000 investment by Plaintiff, Sherman 695 would purchase and distribute PPE and divide the profits 50-50 between itself and Plaintiff. *See* JVA; SAC ¶ 203. Norman Gray, as the sole signatory for Sherman 695, lied to Plaintiff about the details of this PPE deal, including by misrepresenting that "he had a purchase order for PPE lined up worth nearly $8,000,000, and that, with the purchase orders in hand, the risk was virtually zero." SAC ¶ 77. Norman Gray represented that Plaintiff would receive a return on her investment of 40% or more and both Gray and the JVA promised that her investment would be returned by no later than January 2021. *Id.*; JVA; Pizziconi Testimony at 416:1–417:4. Based on these misrepresentations, Plaintiff transferred $500,000 to Sherman 695's bank account. SAC ¶ 81; Pizziconi Testimony at 407:13–408:13, 410:1–5. Plaintiff never received those funds back, nor did she ever receive any return of investment. SAC ¶ 84; Pizziconi Testimony at 410:1–5. And Norman Gray did not use those funds to fulfill any PPE purchase

order, as promised in the JVA.  SAC ¶ 203; Pizziconi Testimony at 410:1–9.  By both allegation and with evidence, Plaintiff has established that Sherman 695 committed fraud upon her.

### *Statutory Theft as Against Norman Gray and Sherman 695*

In Count 2 of the SAC, Plaintiff alleges that Norman Gray and Sherman 695 committed statutory theft under Conn. Gen. Stat. § 52-564.  "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119 . . . ."  *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 771 (2006) (alterations in original) (quotations omitted).  "The definition of larceny under § 53a-119 includes various fraudulent methods of taking property from its owner, including when a person obtains property by false pretenses."  *Scholz v. Epstein*, 341 Conn. 1, 18–19 (2021); *see also* Conn. Gen. Stat. § 53a-119(2).  "A conviction for larceny by false pretenses requires proof '(1) that a false representation or statement of a past or existing fact was made by the accused; (2) that in making the representation he knew of its falsity; (3) that the accused intended to defraud or deceive; (4) that the party to whom the representation was made was in fact induced thereby to act to her injury; and (5) that the false representation or statement was the effective cause of the accused receiving something of value without compensation."  *Marafi v. El Achchabi*, 225 Conn. App. 415, 429–30 (2024) (quoting *State v. Farrah*, 161 Conn. 43, 47 (1971)).  The elements for statutory theft by false pretenses "largely mirror those constituting a claim of false misrepresentation" or fraud.  *Id.* at 430.

The evidence in the record also supports a finding of probable cause that Norman Gray committed statutory theft by false pretenses.  And the allegations in the SAC, deemed admitted, establish that Sherman 695 committed statutory theft by false pretenses.  As explained above, Norman Gray and Sherman 695 made false misrepresentations to Plaintiff to induce her to transfer

16

her money to Sherman 695's bank account, which was then used by Norman Gray for fraudulent purposes. *See supra* at pp. 13–15. It is undoubtedly the case that Norman Gray, both as an individual and through Sherman 695, intended to defraud Plaintiff of her money[10] and did so by lying to her about the PPE deal, about a promised appointment to the board of Vanessa Research, about the financial wellbeing of Vanessa Research, and a host of other false statements. Thus, Plaintiff has met her burden of showing that there is probable cause that Norman Gray committed statutory theft. And the allegations establish the liability of Sherman 695 to the same extent.

### Conversion as Against Sherman 695

Plaintiff also seeks default judgment against Sherman 695 for common-law conversion. "Conversion is '[a]n unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights . . . . It is some unauthorized act which deprives another of his property permanently or for an indefinite time.'" *Curry v. Palmetto Sur. Corp.*, No. 3:21-CV-221 (SRU), 2024 WL 1330079, at *12 (D. Conn. Mar. 28, 2024) (alterations in original) (quoting *Aetna Life & Cas. Co. v. Union Tr. Co.*, 230 Conn. 779, 790 (1994)). "To establish a prima facie case of conversion, the plaintiff had to demonstrate that (1) the material at issue belonged to the plaintiff, (2) that [the defendant] deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff." *Coster v. DuQuette*, 119 Conn. App. 827, 832 (2010) (quotations omitted) (alterations in original). "The elements of civil theft are . . . largely the same as the elements to prove the tort of conversion, but theft requires a plaintiff to prove the additional

---

[10] "[M]oney can be the subject of statutory theft," so long as the plaintiff establishes legal ownership or right to possess the monies in question. *Deming*, 279 Conn. at 771–72.

element of intent over and above what he or she must demonstrate to prove conversion." *Zhang v. Willis*, No. CV146043293, 2015 WL 7941224, at *4 n.3 (Conn. Super. Ct. Nov. 9, 2015) (quotations omitted).

Because Plaintiff has already shown that she is entitled to default judgment against Sherman 695 for civil theft, she has also necessarily shown that she is entitled to default judgment against it for conversion. *See Marinos v. Poirot*, 132 Conn. App. 693, 701 n.6 (2011).

### Breach of Contract as Against Sherman 695

Plaintiff's breach of contract claim against Sherman 695 is premised on its alleged violations of the promises made in the JVA, to which both Pizziconi and Sherman 695 were signatories, as well as on the oral promises related to Plaintiff's wire transfer of $717,000. *See* SAC ¶¶ 203–04; *see generally* JVA. "To prove a breach of contract claim under Connecticut law, a plaintiff must establish: (1) the existence of a contract or agreement; (2) the defendant's breach of the contract or agreement; and (3) damages resulting from the breach." *Associated Constr./AP Constr., LLC v. Hanover Ins. Co.*, No. 3:15-CV-1600 (MPS), 2018 WL 3998968, at *13 (D. Conn. Aug. 21, 2018) (quotations omitted). Plaintiff's well-pleaded allegations, as well as the evidence from the Gray trial, shows that Sherman 695 breached its obligations under the JVA. As discussed above, *see supra* at pp. 15–16, under the JVA, in exchange for Pizziconi's $500,000 investment, Sherman 695 agreed to purchase and resell PPE and thereafter divide the resulting profits equally between Sherman 695 and Pizziconi. *See* JVA; SAC ¶ 203. The JVA also guaranteed the return of her initial investment of $500,000 no later than 4 months after it was executed, or roughly, January 2021. *See* JVA; SAC ¶ 77. Pizziconi wire transferred $500,000 to the Sherman 695 Account, upholding her obligation under the contract, but Sherman 695 failed to meet any of its

18

obligations and Plaintiff never recovered her initial investment nor any distribution of profits. SAC ¶ 84; Pizziconi Testimony at 410:1–5.

Plaintiff's allegations also show that Norman Gray, as a member for Sherman 695, promised her that in exchange for $717,000, Plaintiff could invest in another PPE deal with UConn, earning profits as in the JVA and on the same timeline. *See* SAC ¶ 86. Gray further promised that Pizziconi could take out a mortgage with the fictitious Tranctus Group at a competitive interest rate of 2.2% if she invested this $717,000. *Id.* ¶¶ 85–86. Plaintiff wire transferred $717,000 to the Sherman 695 Account, but Sherman 695 similarly did not use those funds for their intended purpose, and Plaintiff never recovered her initial investment nor any profits. SAC ¶¶ 88, 91; Pizziconi Testimony at 410:1–5.

Based on these allegations and the evidence presented, Plaintiff has demonstrated that a default judgment should enter against Sherman 695 on Plaintiff's breach of contract claim.

### Unjust Enrichment as Against Sherman 695

Plaintiff also asserts a claim for the equitable remedy of unjust enrichment against Sherman 695. Unjust enrichment is a "broad and flexible remedy," and "the ultimate question for courts in assessing unjust enrichment claims is whether, under a given set of circumstances, the 'party liable, to the detriment of someone else, obtain[ed] something of value to which the party liable was not entitled?'" *Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 213 (2d Cir. 2021) (quoting *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 452 (2009)). Thus, "[u]nder Connecticut law, a plaintiff seeking to recover for unjust enrichment 'must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that

the failure of payment was to the plaintiffs' detriment.'"  *Id.* (quoting *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557 (2006)).

However, under Connecticut law, the presence of an express contract between the parties in the litigation almost always precludes an equitable action for unjust enrichment.  *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 133 (2d Cir. 2021) (citing *Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 517 (1999)).  This is so unless the contract "'does not fully address [the] subject' of the claim in question."  *Id.* (alteration in original) (quoting *Town of New Hartford*, 291 Conn. at 455).  Here, there is an express contract between Plaintiff and Sherman 695 (the JVA) which encompasses the $500,000 "investment" by Pizziconi.  SAC ¶ 203; *see supra* at pp. 18–19.  There is also an oral contract between Plaintiff and Sherman 695 for the $717,000 "investment" in October 2020.  *See supra* at p. 19.[11]  However, Plaintiff does not allege or rely upon an express contract between Pizziconi and Sherman 695 for the first payment she made to Sherman 695: to wit, the September 3, 2020, transfer of $250,000.  Through this transfer, Sherman 695 was benefited at Plaintiff's expense because she did not receive that which she was entitled to in exchange for these investments.  With respect to the $250,000 investment, she was not provided with a two-percent equity stake in Vanessa Research, a seat on the board, or a salaried position as CIO.  These losses were certainly to Plaintiff's detriment, and to the benefit of Sherman 695, as Plaintiff's money was transferred to its account.  Thus, the Court enters default judgment against Sherman 695 for unjust enrichment.

---

[11] Because the Court has already found that Sherman 695 breached the JVA, Plaintiff is precluded from recovering damages against Sherman 695 for unjust enrichment premised on the $500,000 she provided under the JVA. Similarly, she is not entitled to recover the $717,000 investment under her unjust enrichment claim. *See Adkisson v. Simso*, No. FST-CV-23-6060942-S, 2025 WL 1937355, at *5 (Conn. Super. Ct. July 8, 2025) ("Parties routinely plead alternative counts alleging breach of contract and unjust enrichment, although in doing so, they are entitled only to a single measure of damages arising out of these alternative claims." (quotations omitted)).

**Remedy/Damages**

The Court next addresses the amount of the damages sought in the Application as well as the Motion for Default Judgment against Sherman 695. Plaintiff argues that there is probable cause that judgment will be entered against Norman Gray in the amount of $7,263,511.77. Mot. for Pre-J. Remedy ("PJR Mot."), ECF No. 149, ¶ 7. This figure includes: $1,467,000 in actual damages; an additional $2,934,000 in treble damages for the statutory theft violation under Conn. Gen. Stat. § 52-564, for a total of $4,401,000; and prejudgment interest in the amount of $2,357,004.11, at either a compounded or simple rate of 10% annually for 4.5 years. *Id.* ¶¶ 8, 10–11.

"The damages that a plaintiff claims need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." *N. Jonas & Co. v. Bros. Pool Enters., Inc.*, 638 F. Supp. 3d 193, 202 (D. Conn. 2022) (quotations omitted). "Rather, the Court must arrive at a 'fair and reasonable estimate' based on the evidence presented." *Id.* (quoting *Roberts v. TriPlanet Partners, LLC*, 950 F.Supp.2d 418, 424 (D. Conn. 2013)).

With respect to the default judgment against Sherman 695, Plaintiff seeks all of the above damages, as well as an additional $189,454.98 in moving, storage, and housing costs, as well as legal penalties and fees. Default J. Mem. at 27. She also seeks an additional $970,683.54 (or, in the alternative, $692,606.79) for the difference in the mortgage interest rate between her current mortgage and the one she might have obtained in October 2020. *Id.* at 26–27. Thus, for Sherman 695, Plaintiff seeks a total of either $5,561,138.52, or, in the alternative, $5,283,061.77, plus prejudgment interest at 10% annum. *Id.*

In determining damages on a motion for default judgment, "[t]he outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment d[oes] not give plaintiff a blank check to recover from defendant any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158–59 (2d Cir. 1992) (alterations and quotations omitted). The damages sought must be established "with reasonable certainty." *Transatlantic Marine Claims Agency, Inc.*, 109 F. 3d at 111.

### *Actual Damages—Norman Gray and Sherman 695*

First, Plaintiff has satisfied her burden that Norman Gray and Sherman 695 may be (in the case of Gray) and should be (in case of Sherman 695) found liable for $1,467,000 in actual damages. Norman Gray was convicted at trial of wire fraud for defrauding Pizziconi through three main transactions: (1) the $250,000 transfer from Pizziconi to Gray through the Sherman 695 account on September 10, 2020; (2) the $500,000 transfer from Pizziconi to Gray through the Sherman 695 account on September 25, 2020; and (3) the $717,000 transfer from Pizziconi to Gray through the Sherman 695 account on October 15, 2020. S1 Indictment ¶¶ 7, 10, 15; *Gray*, 2024 WL 4627566, at *1. Each of these fraudulent transactions were made through the Sherman 695 Account, and with Norman Gray acting as an individual and as the principal member of Sherman 695. As to Gray, there is probable cause that he will be found liable for $1,467,000 in actual damages. And as to Sherman 695, Plaintiff has similarly demonstrated her entitlement to this award of actual damages.

### *Treble Damages—Norman Gray and Sherman 695*

Further, under Conn. Gen. Stat. § 52-564, defendants who are found liable for statutory theft are also liable for treble damages. Conn. Gen. Stat. § 52-564 ("Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."). Plaintiff is thus entitled to thrice $1,467,000, which is $4,401,000 as a prejudgment remedy against Gray and as damages in the default judgment against Sherman 695.[12]

### *Prejudgment Interest—Norman Gray and Sherman 695*

Plaintiff seeks prejudgment interest of 10% per annum. However, the Court is not persuaded that such an award is warranted or appropriate. "When the Court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law." *Garnet Analytics, Inc. v. Diversified Sols., Inc.*, No. 3:12-CV-716 (WWE), 2013 WL 6511940, at *8 (D. Conn. Dec. 12, 2013) (quotations omitted). Under Connecticut law, prejudgment interest may be recovered in civil actions "as damages for the detention of money after it becomes payable," up to a maximum of ten percent interest per year. Conn. Gen. Stat. § 37-3a(a). "Among the factors which the court may consider in deciding to award prejudgment interest are: 1) 'whether the detention of money was wrongful under the circumstances'; 2) 'whether the sum recovered was a liquidated amount'; and 3) 'whether the party seeking prejudgment interest has diligently presented the claim throughout the course of the proceedings.'" *Garnet Analytics*, 2013 WL 6511940, at *8 (quoting *Prime Mgmt. Co. v. Steinegger*, 904 F.2d 811, 817 (2d Cir. 1991)). "The trial court also has discretion to choose the rate of prejudgment and postjudgment interest, up to the statutory

---

[12] As Plaintiff correctly observed in the Application and during the PJR hearing, it is appropriate for prejudgment interest to be assessed on the trebled amount of damages. *See Lauder v. Peck*, 11 Conn. App. 161, 167–68 (1987); *LanceSoft, Inc. v. Cowie*, No. 3:22-CV-968 (SDV/SVN), 2024 WL 3342286, at *5 (D. Conn. Jan. 25, 2024).

maximum rate of 10 percent." *Sikorsky Fin. Credit Union, Inc. v. Butts*, 315 Conn. 433, 443 (2015).

The Court agrees that prejudgment interest is appropriate, as all three of the above factors weigh strongly in favor of an award of prejudgment interest. But an interest rate of the statutory maximum of 10%—even accepting the willful, fraud, and bad faith exhibited by Norman Gray and Sherman 695—is inappropriate. "The purpose of § 37–3a is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money." *Butts*, 315 Conn. at 442 (quotations omitted); *see also Tyll v. Stanley Black & Decker Life Ins. Program*, 403 F. Supp. 3d 27, 40 (D. Conn. 2019) (noting that the purpose of prejudgment interest under section 37a-3 is to "ensure that [the plaintiff]—who was entitled to full payment of her claim—is made whole"). Thus, the emphasis that Plaintiff places on the Defendants' bad faith is not controlling in this inquiry. Further, interest rates have plummeted since the 1970s, when section 37a-3 was enacted; whereas the Federal Reserve frequently set the federal funds interest rate between eight and fifteen percent in the 1970s and 1980s, it has not set that rate above ten percent since 1984. *Federal Funds Effective Rate*, Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/FEDFUNDS (last visited Aug. 22, 2025). Thus, a lower interest rate than the statutory maximum is appropriate. *See, e.g.*, *Stuart v. Stuart*, No. X08-CV-020193031, 2004 WL 1730143, at *43 (Conn. Super. Ct. June 28, 2004) (awarding a lower interest rate than requested, in light of the historic lowering of interest rates), *aff'd*, 112 Conn. App. 160 (2009), *reversed on other grounds*, 297 Conn. 26 (2010); *see also LanceSoft, Inc.*, 2024 WL 3342286, at *5 ("Courts typically apply some rate less than the 10% available under § 37-3a.") (collecting cases).

The conduct complained of in the Second Amended Complaint took place between August and November 2020, with fraudulent transactions occurring on September 10, 2020, September 25, 2020, and October 15, 2020, and the time period upon which prejudgment interest will ultimately be assessed is continuing to run, at least as to Norman Gray.[13]  PJR Mem. of Law at 12. The average interest rate for the time period between October 2020 and July 2025 was 2.99%. *Federal Funds Effective Rate*, *supra*.  The Court concludes that three percent in simple[14] interest beginning on October 15, 2020, is a fair and equitable rate for prejudgment interest, especially at this stage and for the purposes of the Application.  *See, e.g.*, *Tyll*, 403 F. Supp. 3d at 41; *Stuart*, 2004 WL 1730143, at *43.  Thus, the Court finds that Plaintiff has established her entitlement to an award of prejudgment interest against Norman Gray and Sherman 695 at a rate of three percent annually running from October 15, 2020, whether assessed as a matter of probable cause or by a preponderance of the evidence.

The Court enters a prejudgment remedy against Norman Gray in the total amount of $5,041,985.56, consisting of actual damages of $1,467,000; treble damages of $2,934,000 (totaling $4,401,000); and prejudgment interest of $640,985.56, at three percent annually as of October 15, 2020.[15]

---

[13] The per diem interest on the PJR for Norman Gray is $361.73.

[14] As mentioned above, Plaintiff also seeks compound interest because "this is a case involving fraud and bad faith." PJR Mem. of Law at 12 (citing *Harris v. Harris*, No. FA-920513790, 2007 WL 3038234, at *1–2 (Conn. Super. Ct. Oct. 2, 2007)).  However, case law "generally does not support compounding of prejudgment interest in Connecticut courts." *LanceSoft, Inc.*, 2024 WL 3342286, at *5 (collecting cases).  Given that Plaintiff's argument in her memorandum consists of only one sentence, *see* PJR Mem. of Law at 12, the Court does not find it appropriate to award compound interest at this stage.

[15] Although the first two tranches of payments occurred before October 15, 2020, the Court views the events as a continuing course of conduct which culminated on that date and by which Plaintiff's actual damages were fully incurred.

### *Consequential Damages—Sherman 695*

Although Plaintiff may not recover the same damages twice, regardless of the number of theories under which liability might be found, *see Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 82–83 (D. Conn. 2019), Plaintiff seeks additional damages from Sherman 695 in connection with the bogus mortgage approval and funding from the Tranctus Group. Specifically, she seeks $30,000 as a result of a penalty she was required to pay because she withdrew from the original closing on her condo; $29,475 in legal fees related to that failed closing; $31,282.22 in hotel and Airbnb costs for temporary housing after the failed closing; and $8,582.55 in moving and storage fees.  In addition, because Plaintiff did not close on her condo in October 2020 (with an estimated mortgage interest rate of 2.625%), when she eventually did close on the condo, she did so with a mortgage with a higher interest rate.  Pizziconi Decl. ¶ 9.  Plaintiff avers that she was approved for a mortgage in spring of 2021 with a principal loan of $1.42 million and an interest rate of 3.625%, but the mortgagor declined to finalize the application because of unspecified concerns about her fraud case.  *Id.* ¶ 10.  Eventually, she was approved for a mortgage with an interest rate of 5.875%.  *Id.*  Plaintiff argues that she is entitled to the difference between the interest that she will have to pay under her current mortgage, less what she would have paid in interest had she closed on the condo in 2020 or with the pre-approved rate in Spring 2021.  She calculates either $692,606.79 of additional interest over 30 years as compared to the mortgage she was pre-approved for in spring of 2021, or $970,683.54 of additional interest over 30 years as compared to the original mortgage she anticipated receiving in October 2020.[16]  *Id.* ¶¶ 11–15.

---

[16] Plaintiff does not aver that she was approved for a mortgage in 2020.  Only that she was in discussions with Morgan Stanley and that she believes she would have secured a mortgage but for the fraud, at the then-nationwide prevailing interest rate of 2.65%.  As discussed below, this is both speculative and conclusory.

Plaintiff also seeks $18,783 in attorney's fees incurred when she attempted to retrieve her stolen funds before the filing of this action; $25,000 in depleted 401(k) savings that she withdrew after the fraud; and $46,332.21 in tax interest and penalties to the IRS and the State of New York incurred when she was required to defer her taxes in 2020.  *Id.* ¶¶ 6–8.  In total, Plaintiff seeks an additional $1,160,138.52 (or, in the alternative, $882,061.77) in damages from Sherman 695 for these harms.

Although a plaintiff "who alleges fraud . . . generally is entitled to [consequential] damages," they must show that those "out-of-pocket expenses . . . are the proximate and natural consequence of the defendants' allegedly fraudulent acts."  *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 347 (D. Conn. 2013) (quotations omitted).  "[P]roximate cause requires . . . some direct relation between the injury asserted and the injurious conduct alleged, and excludes . . . those links that are too remote, purely contingent, or indirect."  *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 21-847, 2022 WL 480475, at *2 (2d Cir. Feb. 17, 2022) (summary order).  Moreover, the damages must be the "natural and proximate consequence of the fraudulent representation," such that the results "must be presumed to have been within the contemplation of the defendant as the probable consequences of his fraudulent representation."  *Turey v. Vayda*, No. CV-03-0408100-S, 2007 WL 1748151, at *3 (Conn. Super. Ct. June 1, 2007) (quoting *Kilduff v. Adams*, 219 Conn. 314, 323–24 (1991)).

With one exception, Plaintiff has not met her burden.  Norman Gray induced Pizziconi to wire transfer $717,000 to the Sherman 695 Account in October 2020 by lying about the Tranctus Group, which he promised would provide her with a mortgage to buy the condo.  S1 Indictment ¶ 13; SAC ¶ 86.  When this was revealed to be a lie, and the mortgage funding fell through,

Pizziconi was unable to close on her condo, SAC ¶¶ 94, 100, and as a result, Pizziconi was charged $30,000 as a penalty for withdrawing from that transaction. Pizziconi Decl. ¶ 4. This penalty was a direct, natural, and foreseeable result of Gray's lie about the mortgage company—which was made to induce Pizziconi to send him money—and it is clear that Gray knew that Pizziconi would fail to close on the condo as a result of that lie. The penalty Pizziconi incurred for withdrawing was thus a direct result of the fraud committed upon her by Sherman 695 through Norman Gray. The Court finds it appropriate to award Plaintiff additional damages in the amount of $30,000 against Sherman 695.

Beyond this penalty, Plaintiff does not cite a single case or statute in her memorandum supporting the other consequential damages she seeks. But it is the plaintiff's burden to establish proximate cause between the defendant's conduct and plaintiff's alleged injuries on a motion for default judgment. *Greyhound Exhibitgroup*, 973 F.2d at 162 (Altimari, J., concurring). "In other words, [the defendant's] default establishe[s] the existence of its liability, not the extent of its liability." *Id.* Default does not give Plaintiff a "blank check" to recover any and all losses that she suffered, however regrettable, from Sherman 695. *See id.* at 159 (majority opinion) (quotations omitted).

Turning to the requested award premised upon her attorney's fees, the "common law rule in Connecticut, also known as the American Rule, is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." *Comm'r of Env't Protection v. Mellon*, 286 Conn. 687, 695 (2008). Plaintiff has not identified any basis, statutory or contractual, to award her attorney's fees. Further, the losses that Plaintiff suffered after the fraud—to include her housing and moving costs, her mortgage interest

differential,[17] her depleted 401(k) savings, and tax interest and penalties—are too attenuated to the fraud to constitute appropriate consequential damages, and Plaintiff offers no argument supporting the validity of these claimed damages.  Although Sherman 695's fraud may be the but-for cause of these losses, there are several degrees of separation between Sherman 695's actions and these losses, not all of which can be laid at the feet of Sherman 695.  Plaintiff's affidavit (Exhibit 10) contains a virtual laundry list of the problems she faced and costs she incurred when she did not close on the condo in 2020, but such items as tax liabilities, 401(k) distributions, alternative living expenses, storage, and the like are hardly in the nature of foreseeable or intended harms flowing from the scheme to defraud.  Plaintiff has thus not met her burden of showing that she is entitled to these consequential damages.

For all of these reasons, the Court awards damages to Plaintiff against Sherman 695 in the total amount of $5,076,344.68, consisting of actual damages of $1,467,000; treble damages of $2,934,000 (totaling $4,401,000); consequential damages of $30,000; and prejudgment interest of $645,344.68, at three percent annually as of October 15, 2020.[18]

**Motion for Disclosure**

In connection with her motion for a prejudgment remedy, Plaintiff also moves for an order of disclosure of assets, pursuant to Conn. Gen. Stat. § 52-278n.  PJR Mem. of Law at 14.  Section 52-278n(a) provides that "[t]he court may, on motion of a party, order an appearing defendant to

---

[17] As noted above, Plaintiff did not actually receive a mortgage commitment in 2020 and only assumes she would have received such a mortgage at the rate then prevailing.  This is not only too attenuated from the fraud, but insufficiently supported with admissible evidence.  Plaintiff's conjecture simply will not suffice.  Similarly, Plaintiff avers that the Spring 2021 mortgage fell through because the lender had unspecified "concerns" regarding the fraud.  Plaintiff cannot testify as to the lender's state of mind; she offers no basis upon which she offers this testimony, and in any event, the vague nature of the assertion does not allow the Court to conclude that these damages, even if not too attenuated, have been established by a preponderance of the evidence.

[18] The per diem interest for Sherman 695 on default judgment is $364.19.

disclose property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy." Conn. Gen. Stat. § 52-278n(a). "Generally, under Connecticut law, a disclosure of assets is ordered if a prejudgment remedy is ordered." *N. Jonas & Co.*, 638 F. Supp. 3d at 203 (quotations omitted).

The Court has found that there is probable cause that Norman Gray have committed fraud and statutory theft and that he will be held liable in the amount of $5,041,985.56. Therefore, Plaintiff is also entitled to disclosure of assets from Norman Gray.

**Conclusion**

The Motion for Default Judgment against Sherman 695 is GRANTED. The Motion for Prejudgment Remedy (ECF No. 149) is GRANTED as to Norman Gray IN PART. The Motion for Disclosure (ECF No. 149) is GRANTED as to Norman Gray. Accordingly, the Court issues a prejudgment remedy, to be separately docketed, in the amount of $5,041,985.56 against Norman Gray.

The Court further enters a default judgment against Sherman 695 in the amount of $5,076,344.68. Rule 54(b) provides that the court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54. The Court finds that there is no just reason for delay in entering a default judgment against Sherman 695.[19] The Clerk of the Court is respectfully

---

[19] A partial final judgment requires: (1) multiple claims or multiple parties; (2) a final decision within the meaning of 28 U.S.C. § 1291 on at least one claim or the rights and liabilities of at least one party; and (3) an express determination by the court that there is "no just reason for delay." *See Ginnet v. Comput. Task Grp., Inc.*, 962 F.2d 1085, 1091 (2d Cir. 1992). The court must also determine that the claims upon which final judgment is entered are separable and extricable from any remaining claim. *See Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1026 (2d Cir. 1992). Here, the Court has granted Plaintiff's motion for default judgment against Sherman 695 on all counts. The Third Amended Complaint asserts multiple claims against multiple defendants, and this order qualifies as a final determination as to the claims against Sherman 695. As to the third factor, Sherman 695 has been in default for almost a year and a half. ECF No. 52. There will be no prejudice to Sherman 695 or the other defendants by a partial

requested to prepare a Judgment, pursuant to Rule 54(b), in favor of Plaintiff and against Sherman 695 as set forth herein.

      **SO ORDERED** at Bridgeport, Connecticut, this 22nd day of August, 2025.

                */s/ Kari A. Dooley*
                KARI A. DOOLEY
                UNITED STATES DISTRICT JUDGE

---

judgment against Sherman 695 (indeed, none of the other defendants filed an opposition or response to the motion for default judgment), but further delay in the judgment may very well prejudice Plaintiff further in her collection efforts. Thus, the Court finds that Rule 54(b) certification is warranted in this case.